FILED
06/06/2017
Clerk of the
Appellate Courts


IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2017

## STATE OF TENNESSEE v. JEFFERY DWIGHT RAY

**Appeal from the Circuit Court for Morgan County**
**No. 2014-CR-46    Jeffery H. Wicks, Judge**

_____

### No. E2016-01533-CCA-R3-CD
_____

Following the Defendant's, Jeffery Dwight Ray's, guilty-pleaded conviction for aggravated statutory rape, the trial court imposed a sentence of three years' incarceration. The Defendant appeals, arguing that he is a suitable candidate for alternative sentencing pursuant to the statutory considerations outlined in Tennessee Code Annotated section 40-35-103. Following our review, we affirm the trial court's alternative sentencing decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Kim R. Nelson, District Public Defender; and Harold D. Balcom, Jr. and Walter B. Johnson II, Assistant District Public Defenders, for the Appellant, Jeffery Dwight Ray.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Russell Johnson, District Attorney General; and Alyson Kennedy, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

On June 10, 2013, the sixteen-year-old victim reported that her uncle, the forty-six-year-old Defendant, raped her. Thereafter, a Morgan County grand jury charged the

Defendant with aggravated statutory rape, a Class D felony. See Tenn. Code Ann. § 39-13-506. He entered an "open" guilty plea on February 24, 2016.[1]

The trial court originally set the Defendant's sentencing hearing for May 23, 2016, but he failed to appear. After a capias was issued for the Defendant's arrest, his presence was secured, and a sentencing hearing was held on June 24, 2016. At the hearing, the presentence report was entered as an exhibit, the Defendant stipulating to its admission.

From the presentence report, we glean the following details surrounding the events: On the evening of June 9, 2013, the victim was visiting her aunt and uncle who lived next door. The Defendant's friend, "Rusty,"[2] was also present in the home, and according to the victim, everyone present was drinking and watching television. Sometime that evening, the victim and Rusty went upstairs to the attic and started "making out." She stated that she performed oral sex on Rusty but that he did not want to go any further because she was a minor. According to the victim, when the Defendant came upstairs and saw what was going on between the victim and Rusty, the Defendant "pulled his penis out and told [the victim] he wanted what Rusty got." The victim, however, told the Defendant "no," and the three of them went back downstairs and continued watching television and drinking.

Later, Rusty left the residence; the victim's aunt went to take a shower; and the victim went back upstairs to listen to music. The victim stated that the Defendant, thereafter, came upstairs and sat beside her, again asking for sex. She once more said "no," but according to the victim, the Defendant forced her to perform oral sex on him and then raped her. After the Defendant "finished," she told him that she had to use the bathroom. Instead of going to the bathroom, she ran home and told her grandmother that the Defendant had raped her.

The victim was taken to the hospital and examined, and while there, a nurse administered a sexual assault kit. A saliva sample was also taken form the Defendant. In a report from the Tennessee Bureau of Investigation, it was concluded that the Defendant was a "major contributor" to DNA profiles found in the victim's underwater.

When questioned by the authorities, the Defendant denied any sexual contact with the victim, and the Defendant provided a vastly different story from the victim's. The Defendant claimed that the victim "stalked" him and his wife for six months prior to the offense, frequently stealing from him and making sexual advances towards him and his

---

[1] A transcript of the guilty plea hearing is not included in the record on appeal. Nonetheless, the record is adequate for this court to conduct meaningful review.

[2] This individual's last name is not apparent from the record.

wife. According to the Defendant, on the evening of June 9, 2013, the victim "busted in" on him, his wife, and Rusty. When the victim was told to go home, she stole alcohol from Rusty's truck. However, she later returned and would not leave.

The Defendant claimed that he found the victim and Rusty engaged in sexual intercourse in his attic later that evening. According to the Defendant, he cursed at them and instructed the victim to put her clothes back on. The Defendant stated that, while he continued uttering profanities at Rusty, he pulled his pants down and told Rusty to "kiss [his] a-s," showing Rusty "[his] a-s to kiss." After the Defendant pulled his pants up and went back downstairs, Rusty left the home.

According to the Defendant, his wife spent the next several hours babysitting the drunken victim, who kept trying to kiss his wife while vomiting repeatedly. The Defendant claimed that his wife went to talk to the victim's grandmother around 11:30 p.m. and that he went upstairs to the attic to sleep, locking the door once inside. The Defendant stated that he awoke around 3:00 a.m. sweating, so he "stripped to [his] boxers." After cooling down, the Defendant decided "to relieve tension in [his] testicals" by putting a condom on and masturbating. According to the Defendant, when he ejaculated, he also "s--t [him]self bad." He removed the condom and placed it on a mat before going to the restroom to clean himself up, which he estimated took about twenty-five minutes. While inside the restroom, he heard "sounds in [the] house of movement and doors closing." When he exited the restroom, the front door was open; the victim was gone; the victim's clothes were left in his room; and he discovered a "large marital aid" in his bed. The Defendant stated that he went back to sleep, and when he woke up the following morning, he "had to talk to cops."

Also, in the presentence report, the Defendant provided that he had dropped out of high school following the tenth grade, but he obtained his General Equivalency Diploma in 1998. He reported his mental and physical health as fair. However, regarding his physical health, he listed, "bad knees[,] cancer[] and diabetes in family—[four] months ago had [a] seizure and blacked out[,] having some loss of memory since." The Defendant lived in a single family home with his wife, father-in-law, and his wife's grandmother. According to the Defendant, he had been married for eighteen years and was "loving it." He no longer worked but "pick[ed] up cans and raise[d] chickens with his wife." He also stated that he took "care of [the] homestead" and helped care for the family members in his house. At one time, the Defendant was in Marine Corps but was discharged after going absent without leave.

The Defendant's criminal history, as listed in the presentence report, reflected two misdemeanor convictions for failure to appear and one misdemeanor conviction for breach of the peace. The Defendant had a felony prohibited weapons charge, for which

-3-

he was placed on judicial diversion in November 2008, but he had outstanding court costs related to this charge at the time of the presentence report. A violation of probation warrant had been filed against the Defendant. The Defendant denied any drug or alcohol abuse.

The victim testified at the sentencing hearing. The victim asserted that she "lived in terror for three years" after the incident, being constantly fearful that the Defendant would try to rape her again. She stated that she would not sleep in her own bed at her grandmother's house, sleeping instead with her grandmother or "on the couch with a knife under [her] pillow and a baseball bat on the floor within arm's reach." Also, her "insomnia got worse because [she] refused to sleep most nights because of nightmares." She even moved to South Carolina with her parents to avoid the Defendant. According to the victim, after the rape, she blamed herself and began to harm herself, even attempting suicide; she let "men use [her] for sex"; she developed a problem with drugs and alcohol; she underwent years of therapy, including being institutionalized three separate times; and she took numerous medications for depression and anxiety.

A psychosexual examination of the Defendant was also conducted. The Defendant told his evaluator that he was convicted of possession of marijuana before he got married and that he was placed on probation for that offense, which he completed. He provided a similar version of the rape events to the evaluator; however, this time he included as a detail that Rusty and Rusty's wife were in his home that evening and that he and his wife often "would interchange sex with" the couple. Although the Defendant still denied having sex with the victim, he also said that he did not believe he hurt the victim and that "she may have enjoyed it." He further indicated "that being lonely and wanting to be with someone was a factor in his involvement."

During the examination, the Defendant agreed with the following statements concerning child molestation: "Some people are shy about asking for sex so they really want you to force them."; "Sexual activity with children can help the child learn about sex."; and "It is better to have sex with one's child than to cheat on one's wife." Additionally, the Defendant agreed that women often falsely accuse men of rape, that a woman reports rape long after the fact because she gets mad at the man she had sex with and is trying to get back at him, and that society and the courts are too tough on rapists. After the completion of the examination, it was determined that the Defendant was in the "problem risk range" for committing sexual assault and rape. Additionally, the Defendant's risk of reoffending was scored in the low to moderate range.

The Defendant chose not to testify or allocute.

Following the arguments of counsel, which included a claim of consensual sex by defense counsel, the trial court imposed a sentence of three years as a Range I, standard offender, and denied any form of alternative sentencing. In reaching its sentencing determination regarding length and manner of service of the Defendant's sentence, the trial court made the following conclusions and findings of fact:

And in determining the appropriate sentence in th[ese] events, the [c]ourt has considered the evidence presented at the hearing and this sentencing hearing, the presentence report, the principles of sentencing, and arguments made as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancement factors, and any statistical information provided by the Administrative Office of the Court[s] as to sentencing practices for similar offenses in Tennessee, which is on their website, AOC website. And the [c]ourt's looked at the presentence report, and heard the victim impact statement . . . .

And the [c]ourt did, when looking at the enhancement factors that are set forth in the T.C.A. § 40-35-114, the [c]ourt found that number seven applied. That the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement.

And also looking at number eight, the defendant before trial or sentencing failed to comply with conditions of the sentence involving release into the community, and the way the [c]ourt looks at that is when he pled guilty to this we released him into the community and told him to report back on May the 23rd for sentencing and the [D]efendant failed to appear on that. So we had to actually arrest—have a capias issued for the [D]efendant.

The [c]ourt went on to look at the mitigating factors in T.C.A. § 40-[3]5-113 and found none.

And on the probation considerations, the [c]ourt did look at the presentence report, the facts and circumstances surrounding the offense, and the nature and circumstances of the criminal conduct involved, prior criminal history of the [D]efendant, or lack thereof, whether or not it reasonably appears that the [D]efendant will abide by the terms of probation, whether or not measures less constrictive than confinement have frequently or recently been applied unsuccessfully to the [D]efendant, whether or not a sentence of full probation would unduly depreciate the

-5-

seriousness of this offen[s]e, and whether or not confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses.[3]

This timely appeal followed.

## ANALYSIS

On appeal, the Defendant takes exception to the trial court's complete denial of any alternative sentence, arguing that he "is an appropriate person for an alternative sentence" pursuant to the statutory criteria of Tennessee Code Annotated section 40-35-103. Specifically, he notes that he "has no long history of criminal conduct" and contends that the trial court failed to consider his potential for rehabilitation and that the grant of an alternative sentence does not depreciate the seriousness of the offense. The State responds that the trial court properly exercised its discretion when it ordered the Defendant to serve his three-year sentence in confinement, citing the facts of the offense, the Defendant's claim of innocence, and his failure to appear for the sentencing hearing.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346

---

[3] The trial court checked these factors in its written sentencing order while leaving others blank.

(Tenn. 2008). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6)(A). However, no longer is any defendant entitled to a presumption that he or she is a favorable candidate for alternative sentencing. Carter, 254 S.W.3d at 347. Tennessee Code Annotated section 40-35-102(6) is now only advisory. See Tenn. Code Ann. § 40-35-102(6)(D).

Regardless, an offender is eligible for probation if he or she is sentenced to ten years or less and has not been convicted of certain specified offenses. See Tenn. Code Ann. § 40-35-303(a). While the trial court was required to automatically consider probation as a sentencing option, see Tennessee Code Annotated section 40-35-303(b), no criminal defendant is automatically entitled to probation as a matter of law, see State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). It is the defendant's burden to establish his or her suitability for full probation. See Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b)). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." Hooper v. State, 297 S.W.2d 78, 81 (Tenn. 1956), overruled on other grounds, State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978).

A trial court should consider the following when determining any defendant's suitability for alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1). A trial court should also consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. Tenn. Code Ann. § 40-35-103(5); State v. Boston, 938

-7-

S.W.2d 435, 438 (Tenn. Crim. App. 1996). Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

In this case, the trial court identified the specific factors it considered in its alternative decision:

> the presentence report, the facts and circumstances surrounding the offense, and the nature and circumstances of the criminal conduct involved, prior criminal history of the [D]efendant, or lack thereof, whether or not it reasonably appears that the [D]efendant will abide by the terms of probation, whether or not measures less constrictive than confinement have frequently or recently been applied unsuccessfully to the [D]efendant, whether or not a sentence of full probation would unduly depreciate the seriousness of this offen[s]e, and whether or not confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses.

We conclude that the trial court had more than substantial evidence to order the Defendant to serve his sentence in confinement.

The Defendant submits that the trial court should not have considered him as a defendant with a "long history of criminal conduct." However, the Defendant had two prior convictions for failure to appear, and he failed to appear for the first scheduled sentencing hearing in this case. It was only after a capias was issued for the Defendant's arrest that his presence was secured. Also, he admitted to his psychosexual evaluator that he had a prior conviction for marijuana possession, for which he claimed that he had successfully completed probation. He was placed on judicial diversion in November 2008 on a prohibited weapons offense but still owed court costs at the time of the presentence report was prepared. Moreover, a violation of probation warrant had been filed against the Defendant. The Defendant's history of criminal convictions and criminal behavior lends support to the denial of an alternative sentence. Furthermore, the Defendant has demonstrated that he cannot comply with the terms and conditions of release.

Additionally, the Defendant's agreement with certain statements during his evaluation was troubling, to say the least. He was scored in the problem risk range for committing sexual assault and rape. Accordingly, his potential for rehabilitation was considered.

Regarding the circumstances of the offense, the sixteen-year-old victim was in the Defendant's home on the evening June 9, 2013, drinking alcohol and engaged in sexual activity with the Defendant's friend Rusty. According to the victim, when the Defendant asked her for sex, she said "no," but he forced her to perform oral sex anyway before raping her. The victim documented the traumatic impact these events had had on her, including a suicide attempt and institutionalization. Additionally, the Defendant frequently denied any sexual activity with the victim, refusing to accept responsibility for his behavior. Defense counsel even claimed consensual sex at the sentencing hearing. The Defendant also stated to his psychosexual evaluator that he did not believe he hurt the victim and that she may have enjoyed it. Moreover, the Defendant blamed the victim and created elaborate stories to assuage his actions. Given these facts, confinement is necessary to avoid depreciating the seriousness of the offense.

Upon review, we conclude that the trial court's denial of probation and alternative sentencing did not exceed the wide latitude afforded to the trial court. The trial court properly considered the sentencing principles in its alternative sentencing decision. Accordingly, the Defendant has failed to establish an abuse of discretion or otherwise overcome the presumption of reasonableness.

CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-9-